UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

STEPHEN MANTOOTH, )
 )
        **Plaintiff,** )
 )
v. ) Case No. 10-CV-0261-CVE-FHM
 )
AT&T UMBRELLA BENEFIT PLAN )
NUMBER 1, )
 )
        **Defendant.** )

# OPINION AND ORDER

Plaintiff filed this action seeking, <u>inter</u> <u>alia</u>, to recover benefits and enforce his rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 <u>et</u> <u>seq</u>. (ERISA). Defendant AT&T Umbrella Benefit Plan Number 1 (AT&T) terminated plaintiff's long term disability (LTD) benefits as of July 16, 2009 following a periodic review of plaintiff's file. Plaintiff argues that AT&T "b[ought] a different opinion from non-treating physicians" and the termination of his LTD benefits is the result of "self-dealing and bad faith." Dkt. # 18, at 1-2, 5. AT&T responds that its decision was based on substantial evidence, and plaintiff has not shown that AT&T acted in an arbitrary and capricious manner by terminating his LTD benefits. Dkt. # 23, at 15-19. Plaintiff filed an opening brief (Dkt. #18) and defendant filed a response brief (Dkt. # 23). Plaintiff waived the right to file a reply. <u>See</u> Dkt. # 26.

**I.**

Stephen Mantooth worked for Southwestern Bell Telephone Company (SBTC) as a customer service technician from January 1999 to November 2005. SBTC classified this position as a "heavy" job requiring the employee to "drive, walk, stand, lift, carry, climb, crawl, bend, [and]

stoop." Dkt. # 16-2, at 110. Mantooth was eligible to participate in the SBC Communications Inc. Disability Income Plan,[1] and this program was offered as part of a broader employee benefits plan of which SBC Communications Inc. was the plan administrator. Dkt. # 16-1, at 9. Mantooth suffered from back pain and Randy J. Grellner, D.O, performed a microdiskectomy at L4-5 and a foraminotomy at L5-S1 in 2003, but Mantooth continued to work as a customer service technician after the surgery. Dkt. # 16-3, at 3. Mantooth was lifting cable in May 2004 and "felt the onset of predominantly low back pain." Id. at 4. Mantooth visited a neurosurgeon, Michael R. Hahn, II, M.D., who recommended that Mantooth have a single-level posterior lumbar interbody fusion. Mantooth would not be able to return to his job as a customer service technician for at least four to six months, but he could perform sedentary or light work with significant restrictions on lifting, pushing, pulling, and climbing. Dkt. # 16-2, at 208-09. Mantooth underwent spinal fusion surgery on December 7, 2004. Id. at 204. Mantooth requested short term disability (STD) benefits by initiating a claim with the Plan, and he received STD benefits based on a date of disability of November 29, 2004. Id. at 114.

The Plan authorizes an award of STD benefits for partial or total disability, but it is necessary for a claimant to prove total disability to receive LTD. Dkt. # 16-1, at 9. To qualify as partially disabled for an award of STD benefits, an employee must be "unable to perform all the essential functions of his job or another available position assigned by the Participating Company, within the

---

[1] The SBC Communications Inc. Disability Income Plan was part of the broader SBC Umbrella Benefit Plan No. 1. The SBC Umbrella Benefit Plan No. 1 is now known as the AT&T Umbrella Benefit Plan No. 1, and AT&T Services Inc. is the plan administrator. See Dkt. # 23-1, at 1-2; Dkt. # 25-1, at 1. The Court will refer to the SBC Umbrella Benefit Plan No. 1 and the AT&T Umbrella Benefit Plan No. 1 as "the Plan," in this Opinion and Order. References to the "Plan administrator" shall mean the Plan administrator during the relevant time period, whether that entity is SBC Communications Inc. or AT&T Services Inc.

same full- or part-time classification for which employee is qualified" due to injury or illness. Id. at 8. The definition of "total disability" or "totally disabled" depends on whether the claimant is seeking STD or LTD benefits:

> "Total Disability" or "Totally Disabled" means, with regard to Short Term Disability, that because of Illness or Injury, an Employee is unable to perform all of the essential functions of his job or another available job assigned by the Participating Company with the same full- or part-time classification for which the Employee is qualified. "Total Disability" or "Totally Disabled" means, with regard to Long Term Disability, that because of Illness or Injury, an Employee is prevented from engaging in any employment for which the Employee is qualified or may reasonably become qualified based on education, training, or experience. An employee is considered Totally Disabled if he is incapable of performing the requirements of a job other than one for which the rate of pay is less than 50% of his Basic Wage Rate at the time his Long Term Disability started.

Id. at 9. The Plan administrator is authorized to appoint a claims administrator to review claims. Id. at 7. The Plan gives the Plan administrator or the claims administrator assigned to a claim "full and exclusive authority and discretion to grant and deny claims under the Plan, including the power to interpret the Plan and determine the eligibility of any individual to participate in and receive benefits." Id. at 19.

On July 21, 2005, the Plan terminated Mantooth's STD benefits due to insufficient evidence to support Dr. Hahn's recommendation that Mantooth remained totally disabled. Dkt. # 16-2, at 125-26. Two physician advisors found that work restrictions imposed by Dr. Hahn were unreasonable, based on evidence that the spinal fusion was successful and Mantooth could return to work without restrictions. Id. at 52-54, 55-57. Mantooth underwent a functional capacity evaluation (FCE) and it was determined that Mantooth could permanently return to light work only. Id. at 39-40. However, Mantooth's employer did not have any positions available that would accommodate Mantooth's work restrictions. Id. at 36. Based on the results of the FCE and SBTC's

3

inability to accommodate Mantooth's restrictions, the Plan reinstated Mantooth's STD benefits. Mantooth exhausted his STD benefits on November 27, 2005. He applied for LTD benefits and the Plan approved his application for LTD benefits beginning on November 28, 2005.

Mantooth's case manager, Douglas W. Geyer, advised Mantooth that the Plan would be monitoring his medical condition and would request periodic updates about his medical condition. Dkt. # 16-6, at 117. The Plan referred Mantooth for a transferable skill assessment (TSA) for "the possibility of identifying occupations that can be performed within the medical restrictions and limitations and capabilities provided." Id. at 107. At the time of the TSA, Mantooth was 37 years old and resided in Cushing, Oklahoma. The report states that Mantooth had completed high school, and had previously been employed as a customer service technician for SBTC and as a telephone operator for an unidentified employer. Id. The closest job to customer service technician in the Dictionary of Occupational Titles (DOT) was line installer, and the DOT classified this position as heavy work. Id. The reviewer concluded that Mantooth had many transferable skills, but his physical restrictions prevented him from performing even light work. Id. at 108. The town of Cushing had only 8,000 residents and there were no jobs in the Cushing labor market that Mantooth could obtain that would pay at least 50 percent of his base salary as a customer service technician. Id.

On May 25, 2006, Mantooth told Geyer that his ability to perform some physical tasks had improved. Dkt. # 16-3, at 115-16. Mantooth believed that he could climb a ladder and use heavy tools for a short period of time, lift 50 pounds often, and sit or stand for 45 minutes without interruption. Id. at 116. However, Mantooth also stated that he was "not able to do anything" and his ability to engage in his hobby of small household construction projects was severely limited.

4

Id. Geyer referred Mantooth for an independent medical examination (IME) and an FCE. The examiner for the FCE stated that Mantooth "put forth a good effort during [the] FCE," and Mantooth could perform jobs rated at a light physical capacity level. Id. at 102. The examiner also believed that physical therapy would improve some of Mantooth's physical limitations and "he may return to a more functional work position." Id. The IME examiner also determined that Mantooth could work at a light level, but his physical restrictions precluded jobs at a higher physical level. Dkt. # 16-6, at 2-4. The Plan received a letter from Dr. Grellner stating that he agreed with the physical limitations noted by the IME examiner. Dkt. # 16-3, at 92-93.

Geyer requested another TSA of Mantooth based on the physical limitations found in the FCE and IME. The reviewer found that Mantooth had the following transferable skills:

> The employee retains problem solving and judgment skills. The ability to work with hand tools, perform routine and repetitive tasks, the ability to trouble shoot and problem solve, and good communication skills. Mr. Mantooth has the ability to use Microsoft Work, PowerPoint and the Internet. He has extensive customer service and sales experience. He has knowledge of telecommunications systems and auto parts.

Dkt. # 16-6, at 57. However, all of the sedentary jobs that Mantooth could perform required frequent reaching, and there were no gainful occupations for Mantooth within the relevant labor market. Id. Geyer also requested updated medical records from Dr. Grellner, and the records showed no significant improvement in Mantooth's condition. Dkt. # 16-3, at 75. Mantooth applied for Social Security disability benefits, and the Social Security Administration (SSA) awarded him

a monthly disability benefit and a retroactive payment of benefits dating back to May 1, 2005.[2] Id. at 68-69. The Plan assigned Melissa Swibel as Mantooth's new case manager on October 27, 2007. Id. at 65. On August 19, 2008, Mantooth notified the Plan that he had moved to Sand Springs, Oklahoma. Id. at 55.

On April 1, 2009, the Plan referred Mantooth's file to Neal Sherman, M.D., for a periodic review. Id. at 51. Dr. Sherman reviewed Mantooth's medical records and spoke to Dr. Grellner about Mantooth's current physical condition. Id. at 47-50. Dr. Grellner stated that he saw Mantooth on March 25, 2009 and Mantooth complained of lower back pain and numbness in his left leg. Id. at 48. Mantooth was unable to stand or walk for prolonged periods of time, but he could sit for longer periods of time if he alternated sitting and standing. Dr. Grellner restricted Mantooth from lifting more than 10 pounds at any time. Id. Dr. Sherman concluded that Mantooth could return to work in a sedentary occupation:

> My conversation with Dr. Grellner indicates that this individual does have chronic low back pain with periodic exacerbation; however, within the restraints of sedentary work, he would be capable of returning to work activity at this time. His primary restrictions are for prolonged standing and walking, which aggravates the pain associated with his lumbar spondylosis and spinal stenosis. Similarly, he would be restricted from heavy lifting and frequent bending. These would not be an issue with the sedentary work. Based on documentation in file and my conversation with Dr. Grellner, this individual would be capable of returning to sedentary activity as of 04/01/09.

Id. at 49-50.

---

[2] The SSA's decision to award disability benefits resulted in an overpayment of LTD benefits, because the Plan took SSA disability benefits into account when determining the amount of a claimant's LTD benefits. Mantooth reimbursed the Plan using deductions from future payments of LTD benefits, and the Plan recovered the full amount of overpayment by September 2008. Id. at 225.

Following Dr. Sherman's review, the Plan requested another TSA based on Mantooth's current physical condition and geographical location. A key fact for the reviewer was that Mantooth had moved to Sand Springs, which is about 13 miles from Tulsa, Oklahoma. Dkt. # 16-4, at 9. The reviewer was asked to assume that Mantooth "has sedentary capacity with ability to alternate from sitting to standing as needed." Id. Considering Mantooth's educational background, work history, and physical limitations, the reviewer identified four jobs available in the relevant labor market: telemarketer, service clerk, repair order clerk, and order clerk. Id. at 10. A background check of Mantooth also revealed that he obtained a license to serve process from the state of Oklahoma, and it appeared that the license was valid through July 2010. Dkt. # 16-3, at 38.

Mantooth's case manager, Swibel, recommended that the Plan terminate Mantooth's LTD benefits, and her recommendation was approved. Id. On July 6, 2009, the Plan administrator sent Mantooth a letter notifying him that he no longer qualified for LTD benefits and his benefits would be terminated as of July 16, 2009. Dkt. # 16-4, at 111. Based on Mantooth's restrictions as reported by Dr. Grellner, the Plan administrator determined that Mantooth could work as a telemarketer, repair order clerk, or service clerk, and the median wage for these jobs was equivalent to at least 50 percent of Mantooth's former salary with SBTC. Id. at 112. Mantooth was notified of his right to appeal the decision within 180 days of receipt of the denial letter. Id.

Mantooth appealed the denial of LTD benefits and he included a letter from Dr. Grellner describing an October 8, 2009 examination of Mantooth. Dkt. # 16-4, at 122. Dr. Grellner stated that he "belive[d] [Mantooth] should qualify for permanent disability" based on his medical history, the recommendations of his neurosurgeon, and the severity of his physical symptoms. Dkt. # 16-4, at 121. He stated that:

7

> Mr. Mantooth is unable to stand for more than 30 minutes and cannot lift greater than 20 pounds. He cannot bend, stoop, push, pull, climb stairs or work overhead. Sedentary work is not appropriate because he must lie down frequently to relieve his back pain and spasms and requires frequent changes of position. It is difficult to type of write, or perform fine motor skills with his hands related to the arthritis. He is experiencing depression related to the chronic pain, debilitating affects [sic] of his condition and medications which causes social issues.

Id. at 120. Dr. Hahn saw Mantooth on September 21, 2009 and reviewed Mantooth's most recent MRI scan, and noted that Mantooth was still showing a "disc bulge at L2-3 with mild spinal stenosis and spondylosis at L3-4 . . . ." Id. at 123. He found that "the likelihood of [Mantooth] being able to do engage [sic] in worthwhile employment would be extremely low." Id. at 124.

The appeals specialist assigned to Mantooth's appeal, Angela DeBolt, requested for his appeal independent reviews of Mantooth's file by specialists in psychiatry, neurosurgery, and internal medicine. Id. at 137. Robert N. Polsky, M.D., a board certified psychologist, found no medical evidence that Mantooth suffered from anxiety or depression after October 24, 2007, and Mantooth's more recent medical records did not support a finding that Mantooth had any other psychiatric disorder. Id. at 142-43. The internal medicine reviewer, John Leddy, M.D., stated that the "clinical findings from an internal medicine perspective do not support an inability for Mr. Mantooth to perform any occupation as of 07/16/09 through present." Id. at 147. Dr. Leddy noted Mantooth's complaints of back pain and depression, but found that Mantooth's vital signs were normal and there was no evidence of internal illness, such as esophagitis or stomach or gastrointestinal illness, during the relevant time period. Id. at 146. Board certified neurosurgeon J. Parker Mickle, M.D., reviewed Mantooth's medical history and his more recent complaints of back pain, and found that Mantooth's back pain did not preclude him from performing any occupation. Id. at 150. Dr. Mickle noted that Mantooth's treating physicians did not recommend

additional surgery and Mantooth could perform work at a sedentary or light level. Id. at 151. Each of the reviewers attempted to contact Mantooth's treating physicians, but neither Dr. Grellner nor Dr. Hahn returned the reviewers' phone calls. Id. at 142, 146, 150.

The Plan administrator denied Mantooth's appeal and upheld its decision to terminate Mantooth's LTD benefits. Id. at 170-72. The decision noted that the SSA found Mantooth to be disabled, but stated that a different definition of "disability" applies to applies to Mantooth's claim for LTD benefits and, unlike the SSA, the Plan administrator was not required to apply a treating physician rule. Id. at 171. The Plan administrator relied on the assessments of the three independent physician reviewers to support a finding that Mantooth was not disabled from performing any occupation. Id. at 171-72. A TSA also showed that Mantooth had many transferrable skills and he could perform the jobs of telemarketer, service clerk, repair order clerk, and order clerk within the relevant labor market. Id. at 172. Mantooth filed this case alleging that the Plan's decision to terminate his LTD benefits was arbitrary and capricious.

## II.

As a preliminary matter the Court must establish the proper standard of review for plaintiff's ERISA claim. Plan beneficiaries, like plaintiff, have the right to federal court review of benefit

denials and terminations under ERISA.[3] "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989). Specifically, 29 U.S.C. § 1132(a)(1)(b) grants plaintiff the right "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." The default standard of review is de novo. However, when a plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of a plan – as here – a challenge under § 1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard. See Firestone, 489 U.S. at 115 (applying a deferential standard of review when the plan administrator or fiduciary has discretionary authority to determine eligibility for benefits or to construe the terms of a plan). Under the "pure" version of this standard, a plan administrator's or fiduciary's decision will be upheld "so long as it is predicated on a reasoned basis." Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006). That basis "need not be the only logical one nor even the best one." Nance v. Sun Life Assur. Co. of Can., 294 F.3d 1263, 1269 (10th Cir.2002) (quoting Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir.1999)). The decision merely must "reside[]

---

[3] The Tenth Circuit has unequivocally ruled that an ERISA claimant does not have a right to jury trial on his or her claim to recover unpaid benefits. Graham v. Hartford Life & Acc. Ins. Co., 589 F.3d 1345, 1355-56 (10th Cir. 2009); Adams v. Cyprus Amax Minerals Co., 149 F.3d 1156 (10th Cir. 1998).

The summary judgment process focuses on the existence or lack of genuine issues of material fact for trial. In contrast, in ERISA cases reviewing denial of benefits based on the administrative record, the judgment rendered, like a judgment in appellate settings, is not a "summary" judgment, but a judgment after full review of the administrative record. ERISA claims challenging the denial of benefits are typically replete with disputed questions of material fact which must be resolved by reference to the administrative record or remanded to the plan administrator for further proceedings.

'somewhere on a continuum of reasonableness-even if on the low end." Adamson, 455 F.3d at 1212 (quoting Kimber, 196 F.3d at 1098). A plan's decision will not be set aside "if it was based on a reasonable interpretation of the plan's terms and was made in good faith." Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm., 203 F.3d 733, 736 (10th Cir. 2000).

By contrast, "[i]ndicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by a fiduciary." Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002). The Tenth Circuit has held that "'[s]ubstantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].' Substantial evidence requires 'more than a scintilla but less than a preponderance.'" Sandoval v. Aetna Life & Cas. Inc. Co., 967 F.2d 377, 382 (10th Cir. 1992) (citation omitted). In reviewing the plan administrator's or fiduciary's decision, the reviewing court generally is "limited to the 'administrative record' – the materials compiled by the [decisionmaker] in the course of making [the] decision." Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1201 (10th Cir. 2002). The reviewing court should give less deference to a decision if the plan administrator or fiduciary fails to gather or to examine relevant evidence. Caldwell, 287 F.3d at 1282.

If an ERISA fiduciary plays more than one role – i.e., deciding eligibility and paying benefits claims out of its own pocket – a conflict of interest arises. Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008); Graham, 589 F.3d at 1358. In Glenn, the Supreme Court rejected any argument that this conflict of interest requires courts to shift the burden of proof to the plan administrator in cases where a conflict of interest exists. Glenn, 554 U.S. at 117. The Tenth Circuit has held that Glenn overruled the Tenth Circuit's decision in Fought v. Unum Life Ins. Co. of

11

America, 379 F.3d 997 (10th Cir. 2004), to the extent that Fought required district courts to shift the burden of proof in certain ERISA cases. Holcomb v. Unum Life Ins. Co. of America, 578 F.3d 1187, 1192-93 (10th Cir. 2009). Instead, "*Glenn* embraces . . . a 'combination-of-factors method of review' that allows judges to 'tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together.'" Id. at 1193 (quoting Glenn, 554 U.S. at 118). "A conflict 'should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . .'" Id. (quoting Glenn, 554 U.S. at 117).

The Court finds that AT&T Services, Inc. serves as an ERISA fiduciary and is ultimately responsible for paying claims, and an inherent conflict of interest exists. Defendant argues that it was Sedgewick Claims Management Service, Inc. (Sedgwick), not AT&T Services, Inc., that was responsible for making claims decisions and the Plan administrator had no part in the decision to terminate plaintiff's LTD benefits. Dkt. # 23, at 13. The plain language of the Plan gives the Plan administrator, AT&T Services, Inc., discretionary authority to interpret the Plan and requires AT&T Services, Inc. to pay benefits under the Plan. Dkt. # 16-1, at 15, 19. The Court has also reviewed the administrative record and Sedgwick's role in the review process is unclear. The correspondence sent to plaintiff clearly identifies the AT&T Integrated Disability Service Center as the entity responsible for terminating his LTD benefits. However, each letter to plaintiff contains small print stating that the AT&T Integrated Disability Service Center is "*Adminstered by Sedgwick CMS*." Dkt. # 16-4, at 111. The Court also notes that plaintiff was directed to send his appeal documents to "AT&T IDSC Quality Review Unit." Id. at 117. It would not be reasonable for the Court to

12

assume that plaintiff understood the unstated and vague relationship between defendant and Sedgwick, and the administrative record does not adequately clarify the nature of this relationship. The Court also finds that any ambiguity as to Sedgwick's role in the administration of plaintiff's LTD claim should be resolved against defendant, because it is defendant's recordkeeping that makes it difficult to determine Sedgwick's responsibilities as a claim administrator. Thus, the Court will rely on the plain language of the Plan designating AT&T Services, Inc. as the Plan administrator and making AT&T Services, Inc. responsible for payment of claims. Consistent with <u>Glenn</u> and Tenth Circuit precedent, the Court will "dial back" its deference to the Plan administrator's decision and give some weight to the Plan administrator's inherent conflict of interest. See <u>Weber v. GE Group Life Assur. Co.</u>, 541 F.3d 1002, 1010 (10th Cir. 2008). However, plaintiff has not cited any evidence showing that the conflict of interest was particularly important in this case and the Court will not substantially reduce the level of deference to the Plan administrator's decision. See <u>Holcomb</u>, 578 F.3d at 1193.

Plaintiff asserts two other arguments in an attempt to show that Court should show less deference to the Plan administrator's decision. Plaintiff appears to be arguing that the Plan administrator's decision is entitled to less deference because the termination of benefits was based primarily on peer reviews by three physicians employed by the same company. Dkt. # 18, at 5. Plaintiff cites <u>Pinto v. Reliance Standard Life Ins. Co.</u>, 214 F.3d 377 (3d Cir. 2000), to support his argument that this practice requires the Court to reduce the level of deference shown to a plan administrator's decision. Dkt. # 18, at 6. However, the Third Circuit found that <u>Glenn</u> overruled <u>Pinto</u> and the heightened standard of review described in <u>Pinto</u> conflicts with <u>Glenn</u>'s mandate to determine the severity of a conflict of interest on a case-by-case basis. <u>Doroshaw v. Hartford Life</u>

13

& Acc. Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009). Thus, even if the Court found Pinto persuasive, Pinto is no longer the law even in the Third Circuit to the extent that Pinto would support a reduction in deference or a heightened arbitrary and capricious standard of review. The Tenth Circuit has held that "[g]eneral accusations of bias against [peer reviewers] do not provide a reason to doubt what otherwise appears to be competent and reasonable opinions." Rizzi v. Hartford Life & Acc. Ins. Co., 383 Fed. Appx. 738, 750 (10th Cir. 2010).[4] In fact, reliance on independent physician reviewers may show that the Plan administrator took steps to reduce any inherent bias. Holcomb, 578 F.3d at 1193. Thus, plaintiff's argument concerning the Plan administrator's use of independent physician reviewers is not supported by Tenth Circuit precedent, and this is not a basis to reduce to the level of deference.

Plaintiff also argues that defendant's physician reviewers and decision makers "cherry-picked" from the medical records any evidence supporting termination of his LTD benefits and ignored other evidence that showed that he was still disabled, and this is a procedural defect in the review process supporting a reduction of the level of deference. Dkt. # 18, at 7. The Court will consider whether the Plan administrator's decision was supported by substantial evidence, but plaintiff's disagreement with the weight given to certain evidence does not affect the severity of a Plan administrator's conflict of interest.

### III.

Plaintiff argues that the medical evidence did not change after his claim for LTD benefits was initially approved in 2006 and the primary reason for the termination of his LTD benefits is that

---

[4] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

a new claims examiner took over plaintiff's file. Dkt. # 18, at 5. He claims that defendant engaged in "bad faith and self-dealing" by requesting three physician reviewers from the same company to review his file, and asks the Court not to accept the "fiction that hiring an outside physician supports an 'independent' and 'conflict free' review . . . ." Id. at 7.

Plaintiff's primary argument is that a new claims examiner, Swibel, "[took] over the claim and apparently decided it's time to terminate [p]laintiff's LTD." Dkt. # 18, at 4 (emphasis omitted). Plaintiff is correct that his benefits were terminated after Swibel became the case manager for plaintiff's file. However, plaintiff's argument that Swibel was looking for a way to terminate his LTD benefits, even without a valid justification, is not supported by the administrative record. Swibel was assigned to plaintiff's file on October 27, 2007 and the termination of plaintiff's LTD benefits became effective on July 16, 2009. Dkt. # 16-3, at 65. Almost two years passed between these two events and this is not sufficient to show a temporal connection between Swibel's assignment to plaintiff's file and the termination of his LTD benefits. The administrative record shows that the Plan conducted periodic reviews of plaintiff's file before and after Swibel became plaintiff's case manager. Plaintiff's allegation that Swibel "[took] over the claim and apparently decided it's time to terminate Plaintiff's LTD" is not supported by any evidence, and the mere fact that a new case manager was assigned to plaintiff's file in 2007 has no bearing on the Court's review of plaintiff's ERISA claim.

Plaintiff argues that his medical condition did not change after he was initially found to be disabled and the Plan administrator had no factual basis to terminate his LTD benefits in July 2009. Dkt. # 18, at 5. He argues that Swibel initiated reviews of plaintiff's file with the purpose of finding a reason to terminate his LTD. Id. Defendant conducted periodic reviews of plaintiff's file, but this

15

does not show that defendant was attempting to artificially create a basis to revoke plaintiff's LTD benefits. Tenth Circuit precedent is clear that a plan administrator is not bound to pay benefits indefinitely after finding a claimant eligible to receive benefits, and it is not arbitrary and capricious to reopen a file for further review and updating. Allison v.UNUM Life Ins. Co. of America, 381 F.3d 1015, 1024 (10th Cir. 2004); Kimber, 196 F.3d at 1098-99. The mere fact that defendant periodically reviewed plaintiff's continued eligibility for LTD benefits does not show that defendant's decision was arbitrary and capricious.

Plaintiff also overlooks a key event that triggered defendant's review of his file, because he fails to mention that it was his decision to move to Sand Springs that provided factual support for reversal of defendant's initial decision to approve his claim for LTD benefits. Plaintiff acknowledges that the medical evidence available in 2006 established that he was capable of sedentary work, and his restrictions did not significantly change from 2006 to 2009. Dkt. # 18, at 6-7. The administrative record establishes that plaintiff's claim for LTD benefits was initially approved due to the lack of jobs available in Cushing, even though plaintiff's physical restrictions did not prevent him from performing sedentary work. Dkt. # 16-6, at 108. The results of an FCE in 2006 showed that plaintiff was capable of light work. Id. at 20. It was reasonable for the defendant to take into account plaintiff's relocation to Sand Springs and the proximity of Sand Springs to Tulsa during a subsequent review of plaintiff's file. Sand Springs is only 13 miles from Tulsa and plaintiff does not dispute defendant's conclusion that there are more jobs available in the Tulsa labor market. This is also a case where the decision to grant plaintiff's claim for LTD benefits hinged on plaintiff's geographical location, because the evidence in the administrative record established that plaintiff was capable of sedentary or possibly light work. Although plaintiff

attempts to downplay the importance of his move to Sand Springs, this was a relevant fact that defendant could reasonably have considered in its decision to terminate plaintiff's LTD benefits.

Plaintiff may also be arguing that defendant's decision to terminate his LTD benefits was arbitrary and capricious due to a lack of substantial evidence. See Dkt. # 18, at 5-8. The initial decision to terminate plaintiff's LTD benefits was issued on July 6, 2009, and was based on medical records provided by Dr. Grellner and an independent review of those records by Dr. Sherman. Dkt. # 16-4. Dr. Sherman agreed with the physical restrictions found by Dr. Grellner and found that plaintiff could perform sedentary work. Dkt. # 16-3, at 49. In other words, Dr. Sherman credited Dr. Grellner's findings but found that these restrictions did not preclude plaintiff from working in "any occupation." Defendant identified three occupations that plaintiff was qualified to perform that were available in the relevant labor market. Dkt. # 16-4, at 112. Defendant requested an updated TSA to support its finding that plaintiff's physical restrictions, education, and training would reasonably allow him to apply for these jobs. See Id. at 9-10. The Court also notes that defendant paid plaintiff LTD benefits from November 2005 to July 2009, even though plaintiff's physical restrictions did not preclude sedentary or even light work. This supports defendant's argument that it did not precipitately terminate plaintiff's LTD until it was clear that plaintiff was no longer eligible for benefits.

Plaintiff appealed the termination of his LTD benefits and defendant requested three opinions from independent physician reviewers before issuing a decision on plaintiff's appeal. Dr. Polsky found no psychiatric condition that would prevent plaintiff from working. Id. at 141-44. The internal medicine reviewer, Dr. Leddy, noted plaintiff's complaints of gastrointestinal discomfort, but found that the evidence showed that plaintiff's complaints appeared to have resolved. Id. at 145-

47. He found no other symptoms that would prevent plaintiff from performing any occupation. Id. at 147. Dr. Mickle, a neurosurgeon, found that plaintiff had a stable diagnosis following his spinal fusion in 2005 and plaintiff's treating physicians did not recommend any additional surgery. Id. at 149-51. He noted plaintiff's chronic back pain and physical limitations, but he determined that the medical evidence did not support a finding that plaintiff was unable to perform any occupation. Id. at 151. Plaintiff generally challenges the opinions of the three physician reviewers by asserting a vague claim of bias, but he does specifically identify any factual finding with which he disagrees. Dkt. # 18, at 5, 8. The findings of all three physician reviewers are consistent with the medical evidence in the administrative record, and it was reasonable for defendant to consider this evidence, along with the opinions of plaintiff's treating physicians, when determining whether plaintiff still qualified for LTD benefits. Defendant concluded that plaintiff could perform at least four sedentary occupations available in the relevant labor market, and plaintiff has made no attempt to show that he would be unable to satisfy the physical requirements of any of these jobs.

The Court finds that the Plan administrator's decision to terminate plaintiff's LTD falls well within the "continuum of reasonableness" and this decision is supported by substantial evidence. The administrative record shows that plaintiff could have performed sedentary work as early as 2006, but no such jobs were available in Cushing. This resulted in a finding that plaintiff was disabled and defendant paid plaintiff LTD benefits from November 2006 to July 2009. Plaintiff moved to Sand Springs in August 2008 and defendant conducted a routine re-evaluation of plaintiff's claim. While there was no substantial change in plaintiff's medical condition, Sand Springs is relatively close to Tulsa and there were jobs in sufficient numbers that plaintiff would be qualified for and physically able to perform in Tulsa. The Plan administrator determined that

18

plaintiff was able to work at a sedentary occupation, and this decision is supported by the opinions of three physician reviewers and plaintiff's own medical records. Although Dr. Hahn and Dr. Grellner submitted letters to defendant in September 2009 stating their view that plaintiff was disabled, the Plan administrator was not required to defer to the opinions of plaintiff's treating physicians. See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 833-34 (2003). The Plan administrator did not ignore the opinions of plaintiff's treating physicians or discredit their medical diagnoses but, instead, found that the physical limitations and medical conditions found by plaintiff's treating physicians did not preclude plaintiff from working in a sedentary occupation. As the Court has noted, the Plan administrator had discretionary authority to interpret the Plan and determine plaintiff's eligibility for benefits and, dialing back the level of deference to account for the Plan administrator's conflict of interest, the Court finds that the Plan administrator did not abuse its discretion by terminating plaintiff's LTD benefits.

**IT IS THEREFORE ORDERED** that plaintiff's claim for reinstatement of LTD benefits is **denied**. A separate judgment is entered herewith.

**DATED** this 13th day of April, 2011.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT